DREW, J.
| j Okyeame Woodard was convicted of second degree murder at a jury trial. He was sentenced to serve life imprisonment at hard labor without benefits. His appeal is based solely on the issue of sufficiency. We affirm in all respects.
BRIEF FACTUAL SUMMARY
On October 17, 2006, Okyeame Woodard was kidnapped and tortured by Michael Winbush and another person. Woodard managed to escape. He refused help from the police, saying that he would take care of the situation. Only 10 days later, he killed Winbush, that homicide being the subject of this appeal.
The first victim of Woodard’s revenge was actually Marcus Alexander, a known drug user. On October 22, 2006, Alexander sought drugs at 4120 Lamar Street in Shreveport, the venue of Woodard’s drug-dealing business. Woodard accused Alexander of being acquaintances with one of his captors. Alexander denied the accusa *72 tion and left. Two of Woodard’s associates, Edgar Winfield and Steven Miles, chased Alexander and shot at him, grazing his shoulder with one of the bullets.
Woodard’s next victim, Michael Win-bush, was not as fortunate. On October 27, 2006, 10 days after Woodard’s abduction and 5 days after the attack on Alexander, Winbush came to the crack house on Lamar Street to see Woodard. Instead of selling cocaine to Winbush, Woodard and others forced Winbush into an abandoned house next door. The men bound and beat Winbush. Hours later, they loaded Win-bush into the back of his pickup truck and hauled him to a wooded area on Meadow Lane. The men placed bWinbush, still bound and blindfolded, into the cab of the truck. They poured gasoline on him, then fired gunshots into the truck until it exploded into flames. Winbush died of the gunshot wounds, and his body was burned beyond recognition.
Woodard was tried on an amended indictment charging him with second degree murder.[1] Before testimony commenced, the trial court ruled that the state’s other crimes evidence was admissible to show Woodard’s intent, motive and plan, and also to demonstrate identity and lack of mistake.
TESTIMONY
Lane Smith, a detective with the Shreveport Police Department, testified that:
• he investigated Woodard’s beating and kidnapping on October 17, 2006;
• at the hospital, he saw burns on Woodard’s face;
• Woodard told him that he had gone to a house to meet someone and was there beaten, bound with duct tape, and burned;
• his assailants wanted his house key so they could steal his drug money;
• Woodard said that “Bee-Bop” was one of his captors;
• he finally gave up the key, and thereafter $7,000.00 was taken from his house;
• Woodard told him that he did not want the police to get involved as he would take matters into his own hands;
• the detective went to Woodard’s house and saw no signs of forced entry; and
|a* since the victim would not cooperate, the investigation was suspended.
Yolanda Lewis Johnson, Woodard’s cousin, testified that:
• Woodard’s nickname is “Show Me” or “Show”;
• she cosigned a car loan so Woodard could purchase a Crown Victoria;
• Woodard painted the car blue on top and white on the bottom;
• she visited with Woodard after he had been kidnapped and beaten; and
• she denied previously telling the prosecutor that Woodard had told her that he was going to kill the people who kidnapped him.
Edgar Winfield testified that:
• he was involved in Winbush’s murder, but had pled guilty to aggravated battery in exchange for a 10-year sentence, predicated on his agreement to testify truthfully at Woodard’s trial;
• On October 22, the day of the Alexander shooting, he and his nephew, Steven Miles, were at the Lamar Street crack house;
• Woodard told them of his kidnapping, robbery, and beating by local men;
*73 • while he and Miles were at the crack house, Marcus Alexander arrived;
• Woodard accused Alexander of associating with one of his kidnappers, an allegation that Alexander denied;
• Winfield and Miles followed Alexander, who was walking away;
• Winfield had a loaded 9mm handgun, given to him by Woodard;
• they shot at Alexander nine times, hitting him once in the right shoulder;
• he returned the handgun to Woodard later that same day;
• he identified photographs of Miles, Win-bush, a man named Joseph McKinney, and a photograph of Woodard’s vehicle;
14* McKinney often sought drugs at the crack house on Lamar Street; and
• he shot at Alexander because Alexander threatened him and Miles.
Marcus Alexander, a convicted felon, stated that:
• on October 22, 2006, he went to the crack house on Lamar Street;
• he noticed that Woodard’s face was swollen and burned;
• Woodard asked him if he knew a man nicknamed “Bee-Bop”;
• he denied knowing such a person;
• Winfield and Miles told Woodard of seeing him riding with “Bee-Bop”;
• Woodard told him there was “a war going on” and that he should leave;
• Alexander then left to walk home;
• Winfield and Miles followed him in a car, at which time Winfield began shooting at him, grazing his shoulder with one of the bullets;
• he identified photographs of Winfield, Miles, and Joseph McKinney, another drug user present at the crack house on October 22, 2006;
• there was a small abandoned house next to the crack house; and
• Woodard warned him that when he saw “Bee-Bop” he should inform him that “it was on, on sight” meaning that if Woodard saw him, he would be attacked.
Shreveport Police Department Corporal Rod Johnson testified that:
• he investigated Alexander’s shooting on October 22, 2006;
• Alexander told him a story similar to his trial testimony;
• after the interview, Alexander contacted him to identify the shooter and driver of the vehicle, as he had seen their photos in a local newspaper;
• Alexander told him that Woodard told Winfield and Miles to shoot him; and
I a* this information was passed along to Detective Andy Scoggins, of the Caddo Parish Sheriffs Office, because he was handling the homicide investigation.
Shreveport Police Department Officer David Bonias testified that on October 22, 2006, he took photographs of shell casings found at the scene.
Sgt. Danny Duddy, a crime scene investigator with the Shreveport Police Department, testified that he investigated the scene on the date of the shooting and later took spent cartridge cases from the scene to the Crime Lab.
Collette Fielder testified that:
• on the evening of October 27, 2006, she was traveling down Meadow Lane in Shreveport, with her nephew, daughter and husband;
• she noticed a vehicle parked on each side of the street in a dark area;
• as they drove past, six to 10 African American males ran to the vehicles; and
• when she drove past that area the next day, she saw a burned vehicle.
Rachel Fielder, Collette’s daughter, basically corroborated her mother’s testimo *74 ny, although she remembered that one of the vehicles was a car, painted white and green.[2]
Rachel believed there were four to five men standing by the vehicles, one of which she recalled being a truck.
Shreveport Police Department Sgt. Rita Caldwell testified that she was called to the scene of a vehicle fire on October 27, 2006, on Meadow Lane in Caddo Parish. She discovered a charred body in the passenger’s seat of a burned truck and called for officers to respond from the Caddo 16Parish Sheriffs Office because the scene was outside the jurisdiction of the Shreveport Police Department. She also identified a photograph of the scene of the burned truck.
Joseph Johnson of the Caddo Parish Coroner’s Office testified that:
• he responded to the scene on Meadow Lane on October 27, 2006, whereupon he saw and removed a male burned body from the truck;
• the man’s clothing had been burned off and he noticed ligatures around the victim’s right wrist and duct tape on his eye area;
• he observed trauma to the right back side of the man’s head and identified photographs of the victim; and
• the body was transported to Dr. Frank Peretti for an autopsy.
Detective Andy Scoggins of the Caddo Parish Sheriffs Office testified that:
• he was one of the lead investigators of Winbush’s murder;
• he eventually learned, by tracing the truck’s license plate to another individual, that Michael Winbush was the murder victim;
• as part of his investigation he interviewed Trina Jefferson, who told him that she was dating Edgar Winfield and that he had a friend named “Show”;
• she overheard a conversation between Winfield and “Show” about how they and others had kidnapped, tortured, and killed a man;
• McKinney and a woman named Paige Cranford later identified the individual known as “Show” to be Woodard;
• he received information from a concerned citizen regarding a vehicle at the murder scene that had a blue top and white underside;
• after learning that Woodard owned a car painted those colors, police waited outside the Lamar Street house and when Woodard arrived, the officers took him to the Caddo Parish Sheriffs Office for an interview;
• he also interviewed Joseph McKinney, who stated that he frequently went to Woodard’s house on Lamar Street to buy crack cocaine;
17* McKinney told him that on October 27, 2006, he saw two New Orleans men, one he knew as “Trigger” and the other as “Fat,” carrying a body from a small abandoned house next to 4120 Lamar Street to a small pickup truck;
• McKinney said Woodard offered to pay him to dispose of the body;
• McKinney agreed and drove the truck, while Woodard drove his Crown Victoria to a wooded, dark area on Meadow Lane;
• when McKinney arrived, “Trigger” and “Fat”[3] exited Woodard’s car, placed the body in the cab of the truck, doused the truck with gasoline and began firing gun *75 shots into the truck, which soon caught on fire;
• he obtained a search warrant and searched both houses;
• he found pieces of duct tape in an area between the two houses;
• he also found a folding chair with blood and masking tape attached;
• he found a bloody piece of paper and a bloody blanket;
• he found a roll of masking tape, a bloody album cover, and bloody clothing;
• he also identified a photograph of a tire mark, taken at the scene of the burning truck, which indicated that a vehicle left with a spinning tire;
• police also found a 9mm handgun near the burned truck;
• Bertha Macon told him that she had purchased the gun for Woodard;
• he arrested Woodard for aggravated kidnapping and first degree murder, along with Joseph McKinney, Edgar Winfield, and Steven Miles;
• Woodard did not actually own either of the houses on Lamar Street;
• although McKinney told police that five men were involved in Winbush’s murder, police had not located a fifth suspect; and
• his investigation revealed that Winbush had been bound with tape, beaten, and tortured, and that his body was carried to the bed of his | struck so that the murderers could dispose of the body, information which established the relevance of the items taken from the crack house.
Bertha Macon testified that:
• she knew Woodard as “Show Me” and identified him in open court;
• she had a sexual relationship with Woodard sometime in 2006;
• during that time, she owned a 9mm handgun, a .38 caliber handgun, and a .22 caliber handgun, all of which she kept in her closet for protection;
• on October 27, 2006, she returned home from her son’s football game and noticed a chair turned over on her back steps;
• she also noticed a towel that was not hers in the driveway;
• there were no other signs of forced entry;
• Woodard came over that night and asked her to report the theft of the 9mm handgun;
• she later looked for the handgun, and found it missing;
• she reported the gun stolen;
• she identified the same gun Detective Scoggins had found at the scene of the murder as her 9mm handgun;
• Woodard knew where she kept her guns; and
• when Woodard left her house on the evening of October 27, 2006, he was driving his blue and white Crown Victoria.
Shareva Allen, Macon’s daughter, corroborated her mother’s testimony and further noted that her family did not often have guests at their home.
Katherine Tew testified that she worked at Discount Jewelry and Loan and knew Bertha Macon, who had purchased a 9mm handgun from the pawn shop on December 12, 2005. Tew stated that the serial number on the | ¡,9mm handgun found at the murder scene matched that of the 9mm handgun purchased by Macon.
Clyde Davis testified that:
• he knew Woodard and had purchased drugs from him;
• on October 27, 2006, he was at the crack house on Lamar Street when Winbush drove up to the house in a small S-10 pickup truck;
*76 • as soon as Winbush pulled up, a man told him that “Show Me” wanted him to stay there until he arrived at the house;
• he left the house before Woodard arrived;
• later that same day, Paige Cranford, a drug user and prostitute, came to his home and was very upset because there was a man at Woodard’s house who had been begging for his life, but had been shot; and
• he and a neighbor walked to the crack house where McKinney and a man nicknamed “Catfish” told them to leave, and they did.
Paige Cranford testified that:
• she had been convicted for several felonies;
• she knew Woodard because she had purchased crack cocaine from him;
• during 2006, she would sometimes sleep at the crack house;
• on October 27, 2006, she saw Winbush, also known to her as “Graveyard,” at the Palomar Motel on Greenwood Road;
• she rode with Winbush to the crack house on Lamar Street in his truck;
• they were planning to purchase crack cocaine from Woodard;
• upon arrival, Woodard was on the back porch with the “New Orleans boys”;
• Woodard cut some cocaine for her, which she smoked;
• she saw the “New Orleans boys” grab Winbush and point a gun at him;
| m* Winbush was ordered to the ground and began begging for his life;
• she asked Woodard what was going on, and he said he would let Winbush go after they scared him a little;
• the attackers pulled Winbush into the abandoned house next door;
• she stayed at the house about two hours and saw the “New Orleans boys” enter and leave the abandoned house with tape and rope;
• she never saw Winbush leave the abandoned house;
• she returned to the crack house later that day and noticed that Winbush’s truck had been moved from the front to the side of the house;
• she wanted more crack cocaine, but Woodard told her not to go to the back of the house because he said there was a snake back there;
• the “New Orleans boys” were wearing gloves;
• she identified a picture of Woodard’s blue and white Crown Victoria;
• she identified Steven Miles from State’s Exhibit No. 1 as one of the “New Orleans boys”;
• she could not identify Edgar Winfield as the other “New Orleans boy”; and
• she gave her first statement to police after being warned that she would be charged as an accessory to murder if she did not answer their questions.
Upon being recalled to the stand, Edgar Winfield testified that:
• he moved to Shreveport from New Orleans due to Hurricane Katrina;
• he often went to Woodard’s house to talk with him;
• in October 2006, Woodard told him that some men from the neighborhood had kidnapped, tortured, and robbed him;
• Winbush came to the Lamar Street house on October 27, 2006;
• McKinney told him that Woodard had left;
• Winbush told him to tell Woodard that he had been looking for him;
|n* Winbush said he would be waiting at a motel on Greenwood Road;
• Cranford, who had been inside the house, told McKinney that she would “handle *77 it” and began walking toward Greenwood Road;
• about 15 minutes later, Winbush returned with Cranford in his truck;
• Woodard, Cranford, and Winbush walked to the back of the house;
• McKinney and another man, known as “Shorty,” exited the crack house to meet them and pulled out guns, ordering Win-bush to the ground;
• McKinney and “Shorty” then took Win-bush to the small abandoned house;
• Woodard and Cranford also went inside the house;
• he followed behind;
• McKinney accused Winbush of robbing Woodard, which Winbush denied;
• Winbush’s hands and feet had been tied and he was bleeding from his head, and his bleeding head was resting on a blanket;
• he did not see his nephew, Miles, in the abandoned house;
• Winbush was in the little house from about 11:00 a.m. until dusk;
• at some point he left, and never reentered the house;
• when he returned, he saw McKinney and “Shorty” carry Winbush to the truck;
• he drove with Woodard, Miles, and “Shorty” to a dark, isolated area;
• McKinney followed them in Winbush’s truck;
• McKinney and “Shorty” moved Winbush to the cab of his truck;
• Winbush was begging the men to let him go;
• instead, McKinney poured gasoline all over the inside of the truck;
• McKinney gave “Shorty” a glove;
“Shorty” began firing shots into the truck;
• on the sixth shot, the truck exploded in flames;
• McKinney threw the gun into the trees;
• the firearm used by “Shorty” and McKinney was a 9mm handgun, the same gun Winfield had used to shoot Alexander;
• the men returned to Lamar Street in Woodard’s car;
• he and Miles went home; and
• he had taken a plea agreement with the state, pleading to aggravated battery for a 10-year sentence, in lieu of facing prosecution for attempted second degree murder of Alexander and second degree murder of Winbush.
Steven Miles testified that:
• he often bought drugs from Woodard for resale;
• on October 27, 2006, he went with his uncle, Winfield, to Woodard’s house;
• Woodard, McKinney, and a man nicknamed “N.O.” were there;
• at some point, he was told that a man was tied up on the floor inside;
• he looked in and saw the bleeding Win-bush tied up on the floor;
• Woodard said that Winbush had stolen cocaine from him;
• Winbush eventually admitted to breaking into Woodard’s house;
• Woodard, McKinney, and “N.O.” were all in the small house with Winbush;
• Winbush was moved to the bed of his truck;
• the men covered Winbush with wood before driving off with him;
• he rode with Woodard, “N.O.,” and his uncle;
• they drove to a wooded area and stopped by the side of the road;
• he saw a van with a family in it passing them at one point;
]^« he substantially corroborated Win-field’s version of the facts;
*78 • he identified the house where Winbush had been bound, as well as the masking tape, and the bloody blanket he saw on the floor of the house; and
• he was given a reduced sentence for his truthful testimony about the murder.
Sergeant Gary Baird, of the Caddo Parish Sheriffs Department, testified that he processed the S-10 pickup truck that Win-bush had been driving on the day of his murder, and found several cartridges in the cab of the truck.[4]
Dr. Frank Peretti, a forensic pathologist, testified that:
• he performed Winbush’s autopsy on October 28, 2006;
• when he received the body, it was burned beyond recognition, identifiable only by dental records;
• Winbush was killed from multiple gunshot wounds, with one shot entering behind his left ear, causing his skull to invert into his brain;
• another bullet had passed through the victim’s heart and right lung;[5]
• the body had no soot in the lungs from inhaling smoke, leading to the conclusion that he died of the gunshot wounds before he burned;
• he found signs that Winbush’s hands and feet had been bound and there were remnants of tape over his eyes; and
• he noticed an odor of gasoline on the body.
Joseph McKinney, also known as “Dean,” testified that he purchased drugs from Woodard on occasion. On October 27, 2006, he was at the crack house on Lamar Street when Winbush drove up in his pickup truck.
114Caddo Parish Sheriffs Department Corporal Rodney Spikes testified that he videotaped the search at 4120 Lamar Street and the search of the 4600 block of Meadow Lane. He recovered a 9mm handgun from the woods next to the road.
Corporal Charlotte Hammontree, of the Caddo Parish Sheriffs Department, testified that:
• she was the lead crime scene investigator in the Winbush murder;
• she diagramed the abandoned house at 4100 Lamar Street and identified several of the items seized from it;
• the truck was impounded;
• she identified a spent cartridge she found on the floorboard of the pickup;
• all of the spent cartridges were sent to the North Louisiana Crime Lab;
• she took the 9mm handgun to the Caddo Sheriffs evidence room;
• she recovered a gas can at the murder scene; and
• she took DNA samples of blood from the fender well of the burned truck and collected a bloody shirt from the abandoned house on Lamar Street.
Three employees of the North Louisiana Crime Lab were called:
• Randall Robillard, who was accepted as an expert in the identification of ignitable liquids, identified a vial he received from Corporal Hammontree and opined that the liquid in the vial was gasoline and admitted into evidence;
• Michelle Virana, accepted as an expert in DNA analysis, testified that the DNA *79 contained in the blood sample taken from the truck and from the bloody shirt taken from Lamar Street was consistent with that of Winbush; and
• Richard Beighley, an expert in firearms identification, testified that he analyzed the weaponry and spent cartridges submitted by the Caddo Parish Sheriffs Office, and concluded that the six spent 9mm 1,,r,cartridges were fired from the 9mm handgun submitted to him for analysis. He concluded that two weapons were used at the crime scene, and that the two bullets which Dr. Peretti provided, and the .82 caliber spent cartridges he received from the Caddo Parish Sheriffs Office, were fired from the same gun.
Joseph McKinney testified that:
• on October 27, 2006, he was at Woodard’s house when Winbush arrived;
• “Fat” (Miles) and “Trigger” (Winfield) forced Winbush into the abandoned house;
• Woodard told him that Winbush had broken into his house;
• Winfield asked McKinney to drive Win-bush’s pickup truck;
• he agreed, in exchange for crack cocaine;
• Winfield and Miles put Winbush in the bed of the pickup truck;
• he followed Woodard’s car to a wooded area;
• he saw Winfield pour gasoline on Win-bush;
• he observed Miles fire shots at Winbush and saw the truck ignite in flames;
• the gas can came from the trunk of Woodard’s car;
• after the truck caught on fire, the men returned to 4120 Lamar Street;
• he had no independent recollection of the murder, and had to use the statement he made at his guilty plea hearing to refresh his recollection;
• he admitted to giving a prior statement to police wherein he told them that three people — Miles, Winfield, and Shorty— poured gasoline on Winbush; and
• he told police that Woodard was involved in Winbush’s murder because police had told him that Woodard had made a statement implicating him.
• Sammie Hall testified that:
• she is the mother of Woodard’s daughter;
l ir* she had a blue and white Crown Victoria in her name in 2006 and identified it as the car in the photograph taken by police;
• she drove the car to work every day;
• her work schedule was from 8:80 a.m. to 2:30 p.m.;
• at the time of Woodard’s arrest, he was living with her on Corbitt Street;
• her home was never burglarized;
• she and Woodard often shared use of the Crown Victoria;
• Woodard told her about his kidnapping and torture, as well as his escape from the man and woman who bound him and burned him with a curling iron;
• she knew that Woodard sold drugs;
• he had told her he was not involved in Winbush’s murder; and
• Woodard was not at home on the evening of October 27, 2006.
Okyeame Woodard, the defendant, testified that:
• his nickname is “Show Me” or “Show”;
• at the time of his arrest, he was living with Hall and their daughter at 2652 Corbitt Street and was employed by Mayflower Moving and Storage in Shreveport;
• he did not own the house at 4120 Lamar Street, and several different people sold drugs out of the house;
*80 • he sold drugs there on the murder date, but only for about an hour;
• several people were at the house that morning, including the following: Joseph McKinney, James Minor, “Bee-Love,” “Mississippi,” and “Tee”;
• he saw Winbush that morning with Cranford;
• he had known Winbush his whole life; ■
• he also knew Winfield and Miles;
117* he did not beat, shoot, or burn Win-bush, and told no one to do so;
• he had been convicted of armed robbery on March 5, 1992, and of attempted possession of a firearm on October 10, 2000;
• when he was kidnapped, he was lured into a house by a man who had told him that he wanted to purchase drugs;
• the man pulled out a gun and bound Woodard with duct tape, and his captors took a hot knife and cut his face, stomach and chest;
• the two kidnappers wore ski masks;
• later, a woman and a man known as “Bee-Bop” arrived at the house;
• his abductors attempted to get from him a key to his Corbitt Street home, which he finally gave them;
• someone stole approximately $7,000.00 from his home on that day;
• he escaped while his captors were counting the money;
• they chased after him, shooting as he ran away;
• he never told police not to get involved, but they refused to help him because he was a drug dealer;
• he had no plans to seek revenge for his kidnapping and robbery;
• he knew Marcus Alexander, but never told anyone to shoot at him;
• after fighting with others at the Lamar Street house, Alexander left;
• he did not know that Winfield and Miles chased and shot Alexander;
• he sold the 9mm handgun to Winfield;
• Bertha Macon had sold the 9mm handgun to someone else, and that person had sold it to Woodard for drugs;
• he did not go to his regular job on October 27, 2006, because he planned on selling drugs that day;
• he saw Winbush that day and sold him drugs;
• McKinney pointed a gun at Winbush during the drug sale;
• when Winbush got on the ground, he (Woodard) left;
|i8* he returned after a phone call from Cranford, asking him if he could sell her some crack cocaine, and whether he had seen Winbush;
• he told her he had not seen Winbush, then sold her the cocaine;
• he never saw Winbush again;
• he shared with Hall the use of the white and blue Crown Victoria; and
• that car was in the Corbitt Street driveway on the date of the murder.
The jury unanimously convicted Woodard of second degree murder. He appeals solely on the sufficiency of the evidence.
DISCUSSION ON THE ISSUE OF SUFFICIENCY
Woodard contends that the evidence adduced at trial was insufficient to convict him of second degree murder. In support, he shows that the state used trial testimony from Edgar Winfield, Steven Miles, and Joseph McKinney to prove its case, and these witnesses were suspect because they obtained very favorable plea bargains for their testimony. Woodard also points out that Winfield, the person who shot Alexander, testified that he did so because he was “taking care of his own business.” Woodard also argues that none of the witnesses *81 testified that he had instructed them to shoot Winbush.
The state argues that the evidence is sufficient to support Woodard’s conviction. Specifically, the state urges that Woodard was the only person who had a motive to kill Winbush because he was abducted, tortured, and robbed weeks earlier. Woodard directed Cranford to bring Win-bush back to the house on Lamar Street, Woodard provided the gun used to shoot both Alexander and Winbush, and Woodard led the group of men out to Meadow |19Lane where Winbush was murdered. The gasoline used to burn the truck and Winbush’s body came from Woodard’s car. Furthermore, Woodard was the drug dealer who provided narcotics to several of the participants in the murder, thus guaranteeing they would go along with his plan.
La. R.S. 14:30.1 provides, in relevant part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm[.]
La. R.S. 14:24 provides the definition of “principals”:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Our jurisprudence on the culpability of principals is well settled.[6]
Our law on appellate review of sufficiency claims is also well settled.[7]
| gnViewed in a light most favorable to the prosecution, the evidence adduced at trial justifies the conviction. This was a revenge killing, occurring only 10 days after the defendant’s abduction. He told Shreveport Police Department Det. Smith *82 that he would get his own justice, and he did, quite horrifically.
During the 10 days between the two crimes, Marcus Alexander was shot by Edgar Winfield, who testified that he used a 9mm handgun provided to him by Woodard. Woodard and Alexander both testified that prior to Alexander being shot, Woodard had accused him of being involved in his kidnapping. Alexander further testified that Woodard instructed him to tell one of his alleged captors, “Bee-Bop,” that when Woodard saw him, he would physically attack him.
Winfield testified that on October 27, 2006, Winbush went to 4120 Lamar Street looking for Woodard, but was told by Joseph McKinney that Woodard was not there. A few minutes later, Woodard returned and McKinney had a conversation with him. McKinney then spoke with Paige Cranford, who left the house and returned minutes later with Winbush. McKinney and “Shorty” pointed guns at Winbush and asked him why he had robbed Woodard. Winfield testified that Winbush was then taken to the abandoned house, where McKinney beat a confession out of Winbush concerning the previous crimes against Woodard.
| ⅞1'Winfield testified to the gruesome details that led to the death of Winbush that evening. Portions of Winfield’s story are corroborated by other witnesses:
• Paige Cranford and Steven Miles testified that Woodard said he planned to scare Winbush after taking him to the abandoned house;
• Miles and McKinney confirmed the abduction, shooting, and burning of Win-bush;
• Bertha Macon testified that Woodard stole her 9mm handgun, .38 caliber handgun, and .22 caliber handgun, and then told her to report the weapons missing, and she identified the 9mm murder weapon at trial; and
• Crime lab personnel established that the 9mm spent cartridges found at the murder scene were fired from Macon’s 9mm handgun.
The jury was justified in concluding that the defendant killed Winbush. The physical evidence supports this conclusion. This court does not reassess the credibility of the witnesses or reweigh the evidence. We affirm in all respects.
DECREE
The defendant’s conviction and sentence are AFFIRMED.

. Prior to jury selection, the trial court denied Woodard's motion to exclude two photographs of the victim. The state agreed not to introduce three other photographs.

. Rachel identified the vehicles from a photograph. The car was in fact painted two different colors, but the top was actually blue and the bottom was white.

. "Trigger” was later identified as being Edgar Winfield, and "Fat” as Steven Miles.

. Sgt. Baird and Corporal Hammontree found two 9mm spent cartridges and a cartridge from a .32 caliber handgun under the passenger seat of the truck, and another cartridge on the floorboard. In total, the officers found three spent .32 cartridges and five spent 9mm cartridges. All of these items were admitted into evidence.

. This recovered bullet was admitted into evidence. It was the likely fatal wound.

. ‘‘[UJnder Louisiana law, a person may be convicted of intentional murder even if he has not personally struck the fatal blows.” State v. Wright, 2001-0322 (La.12/4/02), 834 So.2d 974, cert. denied, 540 U.S. 833, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003). A defendant, however, may be convicted as a principal only for those crimes for which he has the requisite mental state. Id. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned” in its commission, thus making them liable as principals. Id.

. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.