999 So.2d 179 (2008)
STATE of Louisiana, Appellee,
v.
Tyrone Joseph BROWN, Appellant.
No. 43,775-KA.
Court of Appeal of Louisiana, Second Circuit.
December 3, 2008.
*180 Louisiana Appellate Project, by James E. Beal, for Appellant.
J. Schuyler Marvin, District Attorney, John M. Lawrence, Assistant District Attorney, for Appellee.
Before WILLIAMS, STEWART and DREW, JJ.
STEWART, J.
The defendant, Tyrone Joseph Brown, was convicted of second degree murder. He was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. The defendant now appeals, urging two assignments of error. For the reasons that follow, the defendant's conviction and sentence are affirmed.

FACTS
On September 27, 2005, Michael Hunt, the victim, checked into the Budget Inn at 2675 East Texas Street in Bossier City, Louisiana. Late that evening/early the next morning, the victim walked to an ATM at Regions Bank on Texas Street in an attempt to withdraw money. Curtis Boykins, a resident at the Budget Inn, accompanied the victim to the bank. While they were standing at the ATM, two boys, LaDarrius Johnson and Tyrone Brown, the defendant, rode up on bicycles. As the victim and Mr. Boykins left the bank, they were followed by the defendant and Johnson.
During the walk back to the Budget Inn, the defendant and Johnson confronted the victim. Johnson snatched his wallet. When the victim asked that his bank card and wallet be returned, Johnson removed the currency from the wallet and tossed it back to the victim. Johnson and the defendant then began to beat the victim about his head and body. The victim fell backwards hitting his head during the altercation. The boys rode away on the bicycles while the victim and Curtis Boykins returned to the inn. The victim retreated to his room where he tended to his wounds. Mr. Boykins checked on the victim *181 approximately 10 minutes later, and the victim said he was all right.
The victim telephoned his father at approximately 1:00 a.m. and told him he had been beaten by two black boys who were traveling on bicycles. The victim was found in his room by Tyrone Harper, who testified he had a "gut feeling" that something was wrong with the victim after seeing the defendant and LaDarrius. Tyrone Harper went to the victim's room and found him on the floor. He then alerted Janice Jackson who was working in the office that night. Ms. Jackson called 9-1-1 and the first officer to arrive on the scene found the victim on the floor gasping for air. Shortly thereafter, the victim stopped breathing and officers began administering CPR. The paramedics arrived and transported the victim to the hospital where he was pronounced dead.
The Bossier City Police Department conducted the investigation.
Sergeant Mike Szempruch, a patrol officer, that he was patrolling in the area of the Budget Inn on September 27 and 28, 2005 when he passed the ATM at the Regions Bank. The officer saw two young black males on bicycles standing near the ATM with an older white man. Finding this peculiar, the officer was going to stop, but he received a call that required his attention. After answering that call, the officer went to the Budget Inn where he talked to some criminal informants and heard about the two young black boys who were riding around the Budget Inn parking lot prior to the incident. Sergeant Szempruch relayed what he had seen at the ATM to the violent crimes unit believing the information might help the investigation. Later, Sgt. Szempruch learned that his tip led to the arrest of the defendant.
Officer Brandon Huckaby testified he was the first to arrive at the Budget Inn. He was met by two people who told him an injured person was in one of the hotel rooms. Standing at the door of the room, Officer Huckaby saw a "bunch of bloody towels on the floor," but he did not see anyone until he walked further inside the room. He then saw the victim lying partially on his stomach on the far side of the bed. Officer Huckaby believed the victim was alive, as he could hear the victim gasping for air.
After finding the victim on the floor, Officer Huckaby contacted the fire department and rolled the victim over onto his back. Once the victim was turned over onto his back, he stopped gasping for air. Officer Huckaby and Officer Brad Nelson administered CPR on the victim until the fire department arrived approximately 10 minutes later.
Detective Kevin Humphrey, the lead case detective, was notified that a deceased person had been discovered in a room at the Budget Inn. Upon arriving at that location, Humphrey, along with other officers in his unit, began processing the scene. Still pictures and video were taken of the room and other evidence was collected. Detective Humphrey and Sergeant Stewart traveled to the city morgue to collect any available evidence from the victim's personal effects. Three ATM receipts from Regions Bank were found in the victim's pockets. Humphrey also reviewed the video from the Regions branch located near the hotel, which showed the victim, the defendant, Johnson, as well as Curtis Boykins, at the ATM location near the times noted on the ATM receipts.
Through various interviews, Humphrey learned that Tyrone Harper told the defendant and Johnson that the victim was at the hotel in room 135, had money, and wanted to purchase drugs. Tyrone Harper identified the defendant from one of *182 the ATM's photo surveillance pictures. Johnson was questioned first and confessed to beating and robbing the victim of two dollars. Johnson implicated the defendant, known to him as "T," in the crime. Detective Humphrey, along with two other detectives, went to the Homewood Apartments in Bossier City trying to locate the defendant. He was found in the back of the apartment complex shooting dice with a group of guys and wearing the same shirt he had on in the ATM video.
Once at the police station, the defendant was given an opportunity to confer with his grandfather before questioning. The defendant, with his grandfather present, was subsequently interviewed and confessed to hitting the victim in the head during the robbery. The defendant gave a statement admitting his involvement in the crime. The defendant was initially arrested for robbery. However, once the autopsy report revealed that the victim died as a result of blunt force head trauma, the defendant was charged with first degree murder.
Humphrey also identified the ATM receipts retrieved from the victim's pockets at the city morgue. The receipts show that withdrawals from the checking account were denied for insufficient funds. The transaction times were 00:52, 00:53, and 00:54.
Detective Humphrey also narrated the presentation of the surveillance camera video obtained from the Budget Inn. He noted that Tyrone Harper went into the victim's room at approximately 3:01 a.m. and didn't leave until approximately 3:09 a.m. Approximately 15 minutes later, Mr. Harper returns to the room with Belinda Jackson.
Detective Patrick McWilliams, an investigator assigned to the violent crimes unit, testified that he obtained a search warrant for one of the hotel rooms, conducted interviews, and seized the surveillance videotape from the Twin Cities car wash. The video showed the victim and Curtis Boykins walking from the direction of the hotel toward Regions Bank with the defendant and Johnson following on bicycles. Later in the sequence, the video shows the defendant, Johnson, Curtis Boykins, and the victim walking from the direction of the bank toward the hotel. Curtis Boykins can be seen moving away from the others while the other three interact. Curtis Boykins continues to move away from the others as they stop several times before they are out of the camera's range.
Deputy McWilliams stated that he interviewed Tyrone Harper, and after the interview, Harper was excluded as a viable suspect in the crime. He explained that Harper was cooperative during the investigation and provided information that was helpful in solving the crime.
On cross-examination, Detective McWilliams testified he believed Harper was cooperative during the investigation despite the report of another officer who concluded Harper provided short answers to questions and was not very cooperative. Deputy McWilliams indicated during all of his interactions with Harper, he found him to be cooperative.
While on the witness stand, Tyrone Harper informed the jury that he did not do anything to harm the victim. He stated that, after finding the unresponsive victim in his room, he went to the desk clerk for assistance. Harper also acknowledged that he spoke with the police several times about the incident and provided them with the information he remembered. He gave a statement informing them that he had told LaDarrius Johnson and the defendant that the victim was staying in the hotel, had lots of money, and was looking to purchase drugs.
*183 Harper testified Curtis Boykins introduced him to the victim, and on that same night, Boykins inexplicably gave him $40.00. After sitting outside talking with the hotel front desk clerk and others, Harper said he had a "gut instinct" that made him decide to check on the victim sometime around 3:00 a.m. At that time, Harper went to the victim's room where he found him lying on the floor unconscious. After shaking the victim, receiving no response from him, and then finding a bloody towel, Harper left the room to seek help from Belinda Jackson, a volunteer who was working at the Budget Inn the night of the incident. When shown the surveillance video of the hotel, Harper could not account for what he was doing in the room over the course of eight minutes nor could he account for the reason it took him 15 minutes to return to the room with the desk clerk.
Belinda Jackson, a volunteer who was working at the Budget Inn on the night of the incident, recalled that she was standing outside smoking when she saw two young black boys riding their bicycles in the hotel parking lot. Jackson had not seen the boys before and did not believe she would recognize them if she saw them again. Jackson testified she went to unlock the door to the victim's room after Tyrone "Wolf" Harper told her that "a friend of his needed help." When she and Harper arrived at the door, it wasn't latched properly, so she did not need the key. After entering the room, Harper showed her a bloody towel that was on the bed, then he walked to the other side of the bed where the victim was lying on the floor. Jackson decided she needed to call the police and left the room to do so. Jackson stated she got the impression that Harper had been in the room before bringing her there, because he knew the exact location of the towel on the bed, as well as where the victim was when they entered the room. Jackson testified she did not see any blood on Harper when he approached her to ask for help.
Debra Lynn Martin, a part-time front desk clerk at the Budget Inn, testified she checked the victim into the hotel on September 27, 2005. She identified a check-in card as the card completed by the victim when checked into the hotel. Martin recalled that the victim would stay at the hotel on an infrequent basis, sometimes staying once or twice a month and at other times as little as every other month. Martin did not know if the victim was acquainted with Curtis Boykins or Tyrone Harper.
Troy Smith was living at the Budget Inn on the night the victim was killed. Smith saw two young black males ride into the hotel parking lot sometime between 10:00 p.m. and 11:30 p.m. One of the boys had something in his pocket. The boys went to one of the rooms and beat on the door for approximately half an hour before Curtis Boykins walked up and spoke to them. Smith focused his attention on the boy he believed had a weapon in his pocket, and he was able to describe the clothing worn by the boy. In court, Smith identified the defendant by saying, "This gentleman right here looks like one of them." On cross-examination, Smith stated he was not certain of the time of the incident, noting it could have been between approximately 10:00 p.m. and 12:45 a.m.
Curtis Boykins, a resident at the Budget Inn, was with the victim the night he was killed. Boykins recalled that the victim asked him to accompany him to the ATM at Regions Bank, and when they arrived at the ATM, two boys on bicycles rode up to them. The victim gave Boykins the pin number for his ATM card, and Boykins "swiped" the ATM card during one of the transactions. Boykins testified he and the victim were walking back to the hotel *184 when the boys took the victim behind a building, where they beat and robbed him. The victim emerged from behind the building with blood on him and stated that he was in pain. The victim walked back to his hotel room after the altercation. Boykins identified the defendant as one of the boys who beat the victim.
After the victim was beaten up, he had small amounts of blood on him as well as several cuts and "sores." The victim also complained that he was having trouble seeing. The victim told Boykins that one of the boys ("the tall dude") who beat him had a "black pistol." Once they arrived back at the hotel, the victim went to his room and started to clean himself up. Fifteen or twenty minutes later, Boykins checked on the victim and found him to be all right. The victim was no longer bleeding at that time. Boykins recalled that the victim was looking for drugs and gave Tyrone Harper $40.00 to purchase drugs, but Harper did not return with the drugs.
Benton Hunt, the victim's father, testified that his son called him on September 28, 2005 sometime between 1:15 a.m. and 1:30 a.m., to tell him that two young blacks robbed him of $2.00 and beat him up. The victim said his nose and jaw were broken during the beating. Hunt advised his son to go to the hospital, and the victim stated that he was bleeding too badly to go. The next call Hunt received was from the police later that morning telling him that his son had died. On cross-examination, Hunt testified he did not consider calling 9-1-1 for his son despite his claims that he was bleeding too badly to go to the hospital.
Detective George Kalmbach, a crime scene investigator, testified that he was responsible for photographing the victim at the hospital as well as bagging the victim's hands to preserve evidence. He also collected various items of clothing and several bloody towels from the hotel room. Other personal effects including a checkbook, a bloody pen, sunglasses, and hats were collected and submitted to the crime lab for testing. A video of the crime scene was taken as the scene was processed.
Jennifer Valentine, a forensic DNA analyst with the North Louisiana Crime Lab, testified that she tested several items submitted in connection with the case. A brown shirt belonging to the victim tested positive on the vision and chemical presumptive test for blood. Strands of hair found on the defendant's T-shirt were in fact the defendant's hair strands. Blood was also found on the victim's sunglasses and pen.
Dr. Frank Peretti performed the autopsy of the victim. Dr. Peretti noted the victim's general cause of death to be head injuries, more specifically, multiple blunt force head injuries. He further explained that the type of injury occurs from the head of the victim coming in contact with an object or an object coming in contact with the head of the victim. The victim was noted as having injuries over his right forehead, an irregular pattern abrasion, and his right eye was blackened. Inside the victim's skull, the doctor found no skull fractures, but did find a subdural hematoma, or a large blood clot, that extended over the right temporal occipital lobes of the brain. The clot was roughly equated to be about a half a cup of coffee. The victim also had a subarachnoid hemorrhage involving the right temporal lobe and the left temporal lobe of the brain. This meant that the victim was bleeding on top of his brain. Dr. Peretti testified that the injuries caused the victim to bleed out slowly around his brain and ultimately caused his death. The pattern abrasion on the victim's forehead was believed to be caused by the butt or barrel of a gun, and immediately under this area was the hemorrhage. The doctor initially noted that *185 the victim's injuries would not have led to immediate incapacitation. The doctor could not give an exact estimate of how long it would have taken the victim to die after sustaining the injury, but he did note that it would have been between one and 24 hours.
Dr. Rita Horton, who serves as the Bossier Parish Coroner, testified that she prepared the victim's death certificate. She determined that the victim's cause of death was multiple injuries to the head and face with an unknown object, also known as blunt force head trauma.
Troy Smith was recalled by the defense and testified he saw the defendant riding into the hotel parking lot and the defendant was concealing something under his shirt. The witness noted that he was a former military police officer, "so I know what an item looks like; basically when it's concealed." The witness did reiterate that he did not see a weapon, but he believed that is what the defendant was carrying. Smith was also asked about his prior testimony that the defendant and Johnson knocked on the victim's door for approximately 30 minutes and why the video surveillance tape did not reflect those actions. The witness testified he was not sure, but he also noted that the video did not show him and his girlfriend walking back to his room during the same time the defendant was pounding on the door. On cross, the witness stated he could have been mistaken about the time and estimated it to have been anywhere between 9:30 p.m. and midnight.
Curtis Boykins was also recalled by the defense. Boykins confirmed giving police several statements during the investigation wherein he indicated that there was a drug deal gone bad between the victim and Tyrone Harper. Boykins testified the victim gave Tyrone $40.00 to purchase drugs, and Tyrone never returned with the money or the drugs. It was also brought out through the witness's testimony that the defendant and Johnson went to the victim's room to sell him some drugs, and when the victim did not have the money, he walked to the ATM in an attempt to get it. Boykins also recalled that the victim told him the boys beat him with their fists about his head, and that the victim saw one of the boys with a gun, but they did not use it on him.
Detective Humphrey was also recalled by the defense. Detective Humphrey denied receiving any information from other detectives or witnesses that indicated the victim and Tyrone Harper were engaged in a heated argument around the time Harper said he was in the victim's room. The detective testified that he determined Tyrone Harper was a witness to the case rather than a suspect, and Harper's criminal record did not factor into the determination. On cross, Humphrey stated that Harper cooperated fully with the investigation, and the information he provided led to the arrest of the defendants.
After trial, a unanimous jury found the defendant was guilty as charged. The defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. This appeal followed.

LAW AND DISCUSSION

Sufficiency of the Evidence
In the defendant's first assignment of error, he contends that the admissible evidence in the light most favorable to the state is not sufficient to convict him of the crime of second degree murder. More specifically, the defendant alleges that the circumstantial evidence presented by the state failed to exclude every reasonable hypothesis of innocence when there was testimony and evidence presented to show *186 that another person was in the defendant's room prior to the victim being found. The defendant alleges that one of the state's witnesses was responsible for beating the victim with a weapon shortly before the victim died.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La. App 2 Cir. 4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
Under the Jackson v. Virginia standard, we review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La. 2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, XXXX-XXXX (La.11/9/06), 941 So.2d 35.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La. App.2d Cir.8/15/07), 963 So.2d 497; State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Louisiana Revised Statute 14:30.1, which defines the crime of second degree murder, provides in part:

A. Second degree murder is the killing of a human being:
(2)(a) When the offender is engaged in the perpetration or attempted *187 perpetration of .... armed robbery,.... simple robbery, .... even though he has no intent to kill or inflict great bodily harm.
Unlike first degree murder no intent to harm or kill is necessary to be a principal to second degree murder occurring during the course of a robbery. State v. Grant, 623 So.2d 204 (La.App. 2d Cir. 1993).
In the instant case, it is clear that the state presented sufficient evidence to convict the defendant of the charged offense. Based on the witnesses' testimony, the state was able to prove that the defendant and Johnson went to the victim's room, possibly with the intent of selling drugs to the victim. The victim left the hotel walking to the Regions Bank ATM with Curtis Boykins. Boykins testified he was surprised when the defendant and co-defendant appeared at the ATM. When the victim was unable to get any money from the ATM, he and Boykins began walking back to the hotel. According to Boykins, the victim was taken behind a building where he was beaten by the boys and his money was taken. Boykins testified that the victim said he saw one of the boys with a weapon, but the weapon was not used in the attack. Another of the state's witnesses, Troy Smith, specifically recalled seeing the defendant when he rode into the hotel parking lot, and at that time, the defendant appeared to be carefully hiding something under his shirt. The witness testified he believed the object to be a weapon, though he did not see it.
Surveillance videos from the hotel, a nearby car wash, as well as the Region Bank were presented to the jury. The videos showed the victim and Curtis Boykins walking to the ATM and being joined by the defendant and Johnson who were riding bicycles. After leaving the ATM, Boykins could be seen distancing himself from the victim and the boys, then being rejoined by the victim who appeared upset and in physical pain. Boykins testified that the victim said he was in pain after the beating. Once back at the hotel, the video showed the victim going to his room, then Boykins going to the room approximately 10 minutes later, then leaving. Boykins testified he was checking on the victim at that time, and when he found that the victim appeared to be all right, he left the room.
Sometime later, the video showed Tyrone Harper going to the victim's room, going inside, then exiting approximately eight minutes later. Approximately 15 minutes later, Harper and the desk clerk, Belinda Jackson, returned to the room. Soon thereafter, police were summoned to the hotel. On cross-examination of the witnesses, defense counsel was able to solicit testimony from Ms. Jackson that it appeared that Harper had previously been in the room; however, the video had already revealed this fact to the jury.
Defense counsel attempted to discredit Harper's testimony by implicating him in a drug transaction gone awry. According to the defense theory, Harper supposedly beat the victim because Harper was unable to return money ($40.00) given to him by the victim to purchase drugs. Harper did admit to taking $40.00 from Curtis Boykins that evening, though he denied the money was for drugs or that he actually received the money from the victim. Apparently, the jury chose to disbelieve this theory of events as portrayed by the defense.
The defendant and Johnson admitted to beating the victim. In the defendant's statement, he admitted that money was taken from the victim by Johnson. The exact amount of money was not determined as accounts varied between two and seven dollars.
*188 Dr. Frank Peretti testified that the victim died as a result of head injuries, or "multiple blunt force head injuries." Dr. Peretti opined that the victim was hit with the butt or barrel of a gun, as an impact site was apparent on the victim's skin. Though some of the victim's injuries were consistent with those received in a fisticuff, the doctor believed the injury to the victim's right forehead was caused by the butt or barrel of a gun. It was in this area that the victim suffered the subdural hematoma and the subarachnoid hemorrhage. The doctor also testified that it was likely that the victim bled slowly from his injuries and that the seriousness of the injury might not have been readily apparent after the beating.
Considering the testimony and evidence presented, we can determine that the direct evidence when viewed in the light most favorable to the state was sufficient to establish that the defendant participated in the robbery and beating of the victim that led to the victim's death. The jury was presented with the defendant's theory of the case and apparently chose to believe the state's theory of the case. The credibility determinations made by the jury should not be disturbed by this court. It is not necessary to reach the state's contention that the defendant's actions were the proximate cause of the victim's death, as the defendant does not argue that there was an intervening cause that produced the victim's death. The defendant's argument is that another actor entirely was responsible for the victim's death. This argument was not believed by the jury. Therefore, this assignment of error is without merit.

Jury Instructions
The defendant argues in his second assignment of error that the trial court erred in structuring jury instructions in such a manner as to effectively comment on the defendant's failure to testify. More specifically, the defendant contends a portion of the jury instructions unintentionally commented on the fact that he did not testify at trial. The defendant further states that the effect was a denial of due process.
Review of criminal trial errors on appeal has long been governed by the contemporaneous objection rule found in La. C. Cr. P. art. 841. State v. Thomas, 27,507 (La. App. 2 Cir. 12/6/95), 665 So.2d 629. This article states in pertinent part:

A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.
Additionally, La. C. Cr. P. art. 801 dictates the necessity of a timely objection to an omitted jury instruction:
C. A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefore shall be stated at the time of the objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.
The portion of the jury charge contested by the defendant reads as follows:
The defendant is not required to testify. No presumption of guilt may be raised, no inference of any kind may be drawn from the fact that the defendant did not testify. Evidence under the control of a party and not produced by him creates a presumption that it was not produced because it would not have aided him.
During the conference to finalize the jury charges, the defendant did not object to the proposed charges. After the jury charges were read by the trial judge, *189 the defendant did not object to the charges. Due to the fact that the defendant failed to properly preserve this assignment of error for review, it cannot now be asserted on appeal.
In State v. Thomas, supra, this court held, "Those circumstances where review has been granted in the absence of a contemporaneous objection were fact-specific situations where the relevant errors substantially affected the fairness of the proceeding and the reliability of the fact-finding process."
The instant case does not present a situation that requires review, because the defendant has failed to show that the fairness of the proceedings and the reliability of the fact-finding process have been affected. The defendant notes that the alleged error appears to have been inadvertent on the part of the trial judge but urges review nonetheless. Such a review is not warranted or necessary. This assignment of error is without merit.

CONCLUSION
For the aforementioned reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.