Judgment rendered May 27, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,706-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

TAYLOR JACKSON KERLEY                 Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 222,285

Honorable Alexandra Aiello Stahl, Judge

* * * * *

LOUISIANA APPEALS AND WRIT SERVICE        Counsel for Appellant
By:  Michael Anthony Mitchell
      Remy Starns
      Holli Ann Herrle-Castillo

TAYLOR JACKSON KERLEY                     Pro Se

JOHN SCHUYLER MARVIN                      Counsel for Appellee
District Attorney

JOSEPH CHANCELLOR NERREN
RICHARD RUSSELL RAY
CODY ALLEN BOYD
Assistant District Attorney

* * * * *

Before PITMAN, STEPHENS, and ROBINSON, JJ.

**ROBINSON, J.**

Taylor Jackson Kerley ("Kerley") was charged with one count of first degree murder in violation of La. R.S. 14:30. Kerley was also charged with one count of aggravated second degree battery in violation of La. R.S. 14:34.7, and one count of simple criminal damage to property in an amount between $1,000 and $50,000 in violation of La. R.S. 14:56(B)(2). Kerley pled not guilty to all charges. The State later dismissed the simple criminal damage count, amended the indictment to second degree murder in violation of La. R.S. 14:30.1, and added the charge of obstruction of justice in violation of La. R.S. 14:130.1. Kerley again pled not guilty to all charges. Following a jury trial on February 1, 2024, Kerley was found guilty of second degree murder, obstruction of justice, and the responsive verdict of second degree battery in violation of La. R.S. 14:34.1.

Motions for a new trial and post verdict judgment of acquittal were denied. Kerley then filed a motion to terminate trial counsel, which was granted, and two public defenders were appointed. Following counsel's refusal to adopt pro se motions filed by Kerley, he filed another pro se motion to terminate counsel and to represent himself. The court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), and granted Kerley permission to represent himself and relieved appointed counsel, but it denied the motion to appoint standby counsel. The court held an additional hearing on Kerley's outstanding pro se motion, denying all but a motion to preserve evidence. Immediately following the hearing, the trial court sentenced Kerley to life imprisonment without benefits for second degree murder, five years for second degree

battery, and ten years for obstruction of justice, all at hard labor, to run concurrently.

For the reasons set forth, we AFFIRM the convictions and sentences.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 29, 2019, at approximately 2:30 a.m., Kerley, then 18 years old, and Wade Cash Gregory ("Gregory"), then 16 years old, went to the Haughton, Louisiana, home of Johnathan Bothwell ("Bothwell") to purchase marijuana and THC syrup. While Kerley and Gregory were there, Bothwell was shot and killed, and Bothwell's mother, Marta Pertuz ("Pertuz"), was struck in the face with a glass mason jar, knocking out her prosthetic teeth.

Kerley was apprehended the day after the incident following a traffic stop and was interviewed by police. He was also interviewed at the police station later that day. Kerley described the events leading up to, during, and following the visit to Bothwell's house. He stated that he and Gregory picked up Gregory's friend on the way to the house. Gregory's friend brought a firearm. Kerley could not name Gregory's friend, but he described him as a "black guy" who was tall, skinny, and about Gregory's age. They made two stops along the way, one at a gas station where Kerley purchased a soft drink and the other at a bridge near Bothwell's home where they removed the vehicle's license plate. Gregory attempted to remove the plate but received assistance from Kerley. Kerley said that Gregory was initially driving, but they switched during one of the stops, and Kerley drove until they got to Bothwell's house. Kerley also stated that Gregory came up with the idea of the robbery and discussed it with the friend, but he told Gregory and the friend that he did not want to rob Bothwell and had the

2

money to pay for the drugs. Kerley told police that Bothwell met them outside, then both he and Gregory went inside; however, Kerley went back outside to get his drink from the vehicle for mixing the THC syrup. When doing so, he heard two gunshots, and Gregory ran outside shortly after, slipping in the driveway before reaching the car. Kerley stated that Gregory told him that Bothwell went after him when he realized he was being robbed, and Gregory shot him in self-defense. Kerley also stated that Bothwell had mentioned that Pertuz was in the bathroom, but he never saw her, and Gregory never mentioned anything about her. Kerley and Gregory fled the scene after the incident. They stopped again to put the license plate back on the vehicle and later threw the gun cartridge in a lake. Kerley maintained that Gregory's friend remained with them until Kerley dropped him off shortly after the incident.

During Gregory's police interview, he stated that he and Kerley had been working on a car all night until Kerley left with a girl. However, Gregory ultimately testified at trial as to his and Kerley's involvement in the incident. He stated that he and Kerley had plans to buy marijuana from Bothwell, but they made plans to rob him at gunpoint on the way there. He stated that Kerley had been driving and Gregory was in the passenger seat. Upon arrival at Bothwell's house, Gregory then got in the driver's seat, as they planned for Gregory to be the getaway driver. He stated that he never went inside, and Kerley went into the house alone with the gun. He stated that he heard two gunshots while Kerley was in the house, and Kerley came out shortly after, slipping in the driveway. Gregory stated that they stopped close to the house after fleeing the scene, and Kerley put the license plate back on the vehicle. He also stated that they agreed to get rid of the

3

magazine and Kerley threw it in the lake. They then traveled straight to Shreveport with no stops. There were no questions during Gregory's testimony by either the State or defense counsel regarding the presence of a third person as alleged by Kerley. Gregory testified that he had not received a plea deal at the time of his testimony, but the possibility of a plea agreement of as little as five to ten years' imprisonment had been discussed.

Pertuz generally described her attacker to police at the scene but said she would not be able to identify him if she saw him again. However, she identified Kerley as the attacker in a photographic lineup the night after the incident. She stated that she was 80 percent sure of the identification, then 90 percent after looking again. Pertuz testified at trial that she got a good look at her attacker when she paused outside the bathroom doorway just prior to her attack, and she identified Kerley in court as the perpetrator. She testified that she never saw Gregory in her house the evening of the incident, and she only saw him for the first time during the trial.

Detective Tab Cahn ("Det. Cahn") testified regarding his investigation, as well as his roadside interview of Kerley. Audio of the interview was played at trial. Det. Cahn testified that the video footage obtained from Circle K where Kerley had stopped did not show that there was a third person present, though Kerley claimed that he was in the back seat out of view at the time. Det. Cahn further confirmed that Gregory had an injury to his finger, as stated by Kerley. Kerley had claimed the injury was from when the gun jammed, but Det. Cahn stated that he was unsure if it was consistent with any sort of gunshot wound. He also confirmed that Kerley had washed the clothes he was wearing during the incident.

4

Detective Stephen Mackey ("Det. Mackey") was the lead investigator for the case. He conducted Kerley's interview at the police station. This interview was presented at trial. Det. Mackey testified that the Circle K footage showed someone with a build like Kerley walking away from the camera and getting in the passenger seat. He also referred to footage obtained at Brookshires showing someone matching Kerley's description getting out of the passenger side and opening the driver's side door where a white male was sitting. Det. Mackey also stated that there was no evidence of a black male in either video. None of the footage was ever presented at trial; rather, it was only referred to during the detectives' testimony. Det. Mackey further testified that blood stains were found on the passenger side of Kerley's van, and samples thereof were sent to the lab for testing.

Sergeant Tim Wooten ("Sergeant Wooten") testified in detail regarding the digital forensics for both Kerley's and Gregory's cell phones the night of the incident. Sgt. Wooten had obtained GPS and health data from both phones. He explained that the cache only held around seven days of information before clearing data to make room for new data, the system only keeping whatever information it considered significant. Kerley provided the passcode to his phone and consented to a search, which was done within the seven-day period. Gregory's phone was obtained pursuant to a warrant, and only after that time frame was his phone searched; therefore, the GPS data was incomplete. Videos tracking the GPS coordinates for each phone were presented at trial.

Sgt. Wooten explained that the GPS location software created "dots" to indicate positional data, each dot having different accuracy distances. The smaller the dot, the shorter the distance radius. If the dots were farther apart,

it could mean that the phone was moving quicker over a distance. When the dots were stacked, the phone was in a general location for a longer period of time. Sgt. Wooten testified that at 3:15 a.m., the time of the shooting, Kerley's phone was within a 32-foot circle directly over the house. Gregory's phone only had one dot with an area that touched the house, which would indicate the phone being either inside or just outside the house. He stated that Kerley's phone had more GPS points at the house, but explained that it is uncertain which GPS points are considered significant by the algorithm versus which were deleted due to the timeframe.

The video presented at trial showing the GPS tracking had a starting point at 2:53 a.m. and lasted approximately 30 minutes, so that it included the 3:15 a.m. shooting as well as when they stopped to change out the license plates both times. It did not include the time when they would have left Kerley's home and later returned. Therefore, no GPS evidence was presented that could have confirmed or denied Kerley's assertion that they picked up and dropped off Gregory's friend.

Detective Jonathon Jacks testified as to the crime scene evidence. A firearm was found on the ground to the right of the driveway, which had a cartridge inside the well but no magazine. Also found were a mushroomed bullet retrieved from the bedroom, an unspent cartridge found under a computer desk, a spent cartridge from the bedroom threshold, and a casing found near the desk. There were glass pieces from the broken mason jar that had already been swept up by Pertuz. A bullet was also removed during the autopsy. Detective Michael Stelly testified that the projectiles and casings were tested, and it was concluded that the two 9 mm cartridge casings and the two bullets were all fired from the Taurus pistol retrieved at the scene.

6

Dr. Jessica Esparza ("Dr. Esparza") testified as to the fingerprint and DNA testing of the evidence collected. She stated that swabs from the gun grip and gun were tested, which showed a mixture of DNA present from at least three people, but no one could be excluded or included as matches. The DNA from the glass pieces was also inconclusive. Dr. Esparza also testified that the blood samples obtained from the passenger side seat and door of the van were a match to Gregory.

On March 16, 2020, Kerley was charged by indictment with first degree murder, aggravated second degree battery, and simple criminal property damage in an amount between $1,000 and $50,000. Kerley pled not guilty to all charges. In January 2023, the State amended the indictment to the charge of second degree murder, added the charge of obstruction of justice, and dismissed one count of simple criminal property damage. Kerley maintained pleas of not guilty to all charges.

The trial began on January 29, 2024. On February 1, 2024, the jury returned unanimous guilty verdicts of second degree murder and obstruction of justice, as well as a responsive verdict of second degree battery. The trial court ordered a presentence investigation ("PSI") and set sentencing for May 6, 2024. However, due to multiple pro se motions filed by Kerley, sentencing did not take place until almost one year later.

On April 12, 2024, trial counsel filed a motion for new trial and for post-verdict judgment of acquittal. On May 2, 2024, Kerley filed a motion to terminate his retained trial counsel. The trial court denied trial counsel's motions. It granted Kerley's motion and appointed two public defenders.

Kerley filed numerous pro se motions following trial, including a motion to be recognized as co-counsel with his appointed counsel filed on

7

February 18, 2025. His counsel advised that they were not adopting any of Kerley's pro se motions. The case was reset to April 28, 2025, when Kerley argued the motion to terminate counsel and be recognized as his own co-counsel. The court denied the motion, advising Kerley that he could not have appointed counsel and represent himself at the same time. It then fully addressed the factors of *Faretta*, *supra*, strongly advising Kerley against self-representation but ultimately granted Kerley permission to represent himself and relieved appointed counsel.

On April 29, 2025, Kerley filed a motion to recuse the trial judge. The matter was transferred to another division for a recusal hearing pursuant to the motion. The recusal was heard and denied by a separate judge, and the case was sent back to the trial court. On April 30, 2025, the trial court heard the remaining pro se motions, granting only a motion to preserve evidence. A new motion requesting standby counsel had been filed the same day, but was denied, the court noting Kerley's untimeliness and delay tactics and that it had already decided the matter. The court also denied additional motions for post-verdict judgment of acquittal and new trial. At the same hearing, the trial court immediately imposed the mandatory life sentence without benefits on the conviction of second degree murder, as well as five years on the charge of second degree battery, and ten years for obstruction of justice, all at hard labor, to run concurrently to each other. Kerley appealed his convictions and sentences.

## DISCUSSION

### *Sufficiency of Evidence*

Kerley argues that the evidence in this case was insufficient to prove he was the individual who committed, or was a principal to, the offenses of

second degree murder, second degree battery, and obstruction of justice. In particular, he claims that there was no physical evidence linking him to any of the crimes, and his statements to police were corroborated by evidence and consistent despite his intense interrogation.

Kerley notes that he was not found in possession of a weapon, and his fingerprints were not found on any of the evidence. He was specifically excluded from the broken mason jar and the blood found on the inside of the front passenger door and seat of the van. The blood in the van was a match for Gregory, which Kerley points out corroborates his statement that Gregory came to the car after the shooting with his hand bleeding from having it injured in the gun's slide. The photo of the gun showed the slide was jammed, and Gregory's video interview showed his injured fingers.

Kerley also argues that the GPS forensic data corroborated his statements to police about where he was during that night. He points out Detective Wooten's testimony that, although Gregory's phone did not have as much GPS data, it could have been because it was past the seven-day mark in which the cache keeps the information. He asserts that the fact that Kerley's phone recorded more data at the scene of the murder than Gregory's was misleading because it was not known which GPS points the algorithm considered significant and which ones were deleted due to the time frame. Kerley also referred to the evidence that Gregory's phone flashlight was turned on for eight seconds after the murder, which corroborates his testimony that Gregory had dropped the gun under the van and he would have used his phone flashlight to attempt to look for it.

Kerley further argues that Pertuz's identification was unreliable. He explains that he and Gregory are similar in appearance, both being young,

white, and blond-haired, and Pertuz was never shown a photo array with Gregory included. He also points out that Pertuz told detectives at the scene she would not be able to identify the attacker again. He notes that, during Pertuz's viewing of the photo array, she kept looking at the sheet under the photos to the point the detectives told her several times the second page was a duplicate. Kerley further asserts that Pertuz stated she was only 80 percent sure of the identification but was somehow certain of the identification five years later.

Kerley argues that the State also failed to prove that Pertuz suffered serious bodily injury. He claims that only her dental prosthetic was knocked out and that she never appeared in pain, her lips were not swollen, she had no bruising, and she spoke normally. Further, no medical records were ever presented to substantiate a claim of extensive medical treatment.

The State claims that there was more than sufficient evidence to support Kerley's convictions. The jury determined the evidence was reliable, and the testimony of the witnesses was compelling and credible, supporting the convictions. The State's witnesses included seven law enforcement officers, including experts in cellular mapping and digital forensics, as well as other lay and expert witnesses regarding Kerley's and Gregory's involvement in the crimes. It points out that Kerley's cell phone records placed him not only at the general scene of the murder but actually inside the home. Gregory testified as to their involvement and stated that Kerley was the only one in the house. Kerley admitted going inside the home, while Gregory never admitted to that. Further, Pertuz picked Kerley out of a lineup and later identified him in court. The State also asserts that Kerley's story changed and was vague. Kerley said a "black guy" came

10

along, whom he was unable to identify or describe, and he could not name who stopped the car in order to change out the license plate. The State argues that, because Kerley was in the home during the time frame of the robbery and the killing, he was guilty of second degree murder, whether he was the shooter or just involved in the robbery, because he would be a principal to the crime of killing during the commission of another felony.

The standard for appellate review for a sufficiency of the evidence claim is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 248 (2004); *State v. Cummings*, 95-1377 (La. 2/28/96), 668 So. 2d 1132; *State v. Crossley*, 48,149 (La. App. 2 Cir. 6/26/13), 117 So. 3d 585, *writ denied*, 13-1798 (La. 2/14/14), 132 So. 3d 410; *State v. Murray*, 36,137 (La. App. 2 Cir. 8/29/02), 827 So. 2d 488, *writ denied*, 02-2634 (La. 9/5/03), 852 So. 2d 1020. This standard does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. McGehee*, 15-2140 (La. 6/29/17), 223 So. 3d 1136; *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So. 2d 1165.

An appellate court neither assesses credibility nor reweighs evidence and great deference must be given to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Carr*, 55,692 (La. App. 2 Cir. 5/22/24), 387 So. 3d 886, *writ denied*, 24-00776 (La. 2/28/25), 402 So. 3d

11

486; *State v. Myrick*, 54,606 (La. App. 2 Cir. 9/21/22), 349 So. 3d 92; *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913; *State v. Morrison*, 40,852 (La. App. 2 Cir. 4/12/06), 927 So. 2d 670. The jury's reasonable credibility determination is not to be second-guessed on a *Jackson* sufficiency of the evidence review. *State v. Marshall*, 04-3139 (La. 11/29/06), 943 So. 2d 362, *cert. denied*, 552 U.S. 905, 128 S. Ct. 239, 169 L. Ed. 2d 179 (2007). However, a reviewing court may impinge on a trier of fact's discretion to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000); *State v. Turner*, 51,228 (La. App. 2 Cir. 4/05/17), 217 So. 3d 601; *State v. Woodard*, 47, 286 (La. App. 2 Cir. 10/3/12), 107 So. 3d 70, *writ denied*, 12-2371 (La. 4/26/13), 112 So. 3d 837.

When the issue raised in a sufficiency claim is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. *State v. Mathis*, 52,500 (La. App. 2 Cir. 1/16/19), 263 So. 3d 613. However, in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a requisite factual conclusion. *State v. Fussell*, 55,497 (La. App. 2 Cir. 2/28/24), 381 So. 3d 899; *Myrick, supra*; *State v. Dorsey*, 10-0216 (La. 9/7/11), 74 So. 3d 603; *State v. Burd*, 40,480 (La. App. 2 Cir. 1/27/06), 921 So. 2d 219, *writ denied*, 06-1083 (La. 11/9/06), 941 So. 2d 35. A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of

sufficiency. *Dorsey*, *supra*; *State v. Davis*, 02-1043 (La. 6/27/03), 848 So. 2d 557; *State v. Ponsell*, 33,543 (La. App. 2 Cir. 8/23/00), 766 So. 2d 678, *writ denied*, 00-2726 (La. 10/12/01), 799 So. 2d 490.

As Kerley indicates in his argument, the *physical* evidence does appear to support a finding that Gregory was the shooter. There was evidence that Gregory had an injury to his finger that could have been a result of the gun jamming. His blood was found on the passenger side of the van, which could also have indicated that Kerley was already in the driver's seat and Gregory was the last to enter the vehicle. In addition, while the GPS data did show that Kerley was inside Bothwell's home at some point, testimony supports that Gregory's GPS data was not reliable to exclude him from also being in the home, since some of the data had been deleted. There is also the issue of Gregory's flashlight being used instead of Kerley's during the time when the gun would have been left in the driveway.

On the other hand, the jury heard testimony from Pertuz that Kerley was the person she saw in her home the evening of the shooting and that she had never seen Gregory prior to the trial, which was consistent with her identification of Kerley the day after the shooting. They also heard Gregory's testimony that Kerley was the only one in the house and that they both had agreed to rob Bothwell. The jury saw all evidence presented and heard all testimony, and they were in the best position to determine the credibility of the witnesses. Also, the court pointed out that Kerley (through counsel) had the opportunity to cross-examine witnesses and call his own witnesses to point out any alleged inconsistencies.

The physical evidence and testimony presented was sufficient to establish, at minimum, that Kerley was present in Bothwell's house during

13

the time of the shooting. However, it was also sufficient to establish that he was a participant in the robbery. Kerley intended to go to the house to get drugs from Bothwell, it was his vehicle driven that night, and he was at least aware of a plan to rob Bothwell. Even if he objected to that plan, Kerley continued going to Bothwell's house knowing there was a strong possibility the robbery would take place, because he admitted that Gregory continued to talk about the robbery along the way. Kerley's exact words in his police interview were, "I didn't say shit. I just went along with it." Furthermore, Kerley admitted being the one who actually removed and replaced the license plate, strongly indicating his knowledge that a crime was about to take place, and he was aware that the gun magazine was thrown into the lake after fleeing the scene. Kerley also failed to contact police after the shooting took place, even when he was no longer in the company of Gregory.

La. R.S. 14:30.1 defines the crime of second degree murder as follows:

> A. Second degree murder is the killing of a human being:
> …
> (2) When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery ... even though he has no intent to kill or to inflict great bodily harm.
> …
> B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

La. R.S. 14:64(A) provides in pertinent part:

> Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

La. R.S. 14:24 defines principals to crimes as follows:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act

14

> constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

The State is not required to show that the defendant's conduct was the sole proximate cause of the victim's death in order to satisfy the causation element of this offense. *State v. Smith*, 47,983 (La. App. 2 Cir. 5/15/13), 116 So. 3d 884. Sufficient proof is presented where it is shown that the defendant's actions were a "contributing cause" or a "substantial factor" in the resulting death of the victim. *Id*.; *State v. Stone*, 33,383 (La. App. 2 Cir. 5/15/00), 758 So. 2d 997, *writ denied*, 00-2145 (La. 6/1/01), 793 So. 2d 181. Under La. R.S. 14:30.1(A)(2), no intent to harm or kill is necessary to be a principal to second degree murder occurring during the course of a robbery. *Id*.; *State v. Grant*, 623 So. 2d 204 (La. App. 2 Cir. 1993), *writ denied*, 629 So. 2d 400 (La. 1993); *State v. Brown*, 43,775 (La. App. 2 Cir. 12/3/08), 999 So. 2d 179, *writ denied*, 09-0047 (La. 9/25/09), 18 So. 3d 81. Under general principles of accessorial liability, La. R.S. 14:24, all parties to a crime are guilty for deviations from the common plan which are the foreseeable consequences of carrying out the plan. *State v. Smith*, 98-2078 (La. 10/29/99), 748 So. 2d 1139. The risk that an unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary, which every party to the offense must accept no matter what he or she actually intended. *State v. Cotton*, 341 So. 2d 362 (La. 1976). If a co-perpetrator in an aggravated burglary was guilty of second degree murder because he shot and killed the victim, then defendant, as a principal in the burglary was likewise guilty of the same offense. *Id*. A homicide committed during flight from an aggravated burglary, or to

facilitate flight from the scene, therefore constitutes felony murder. *State v. Anthony*, 427 So. 2d 1155 (La. 1983).

The evidence showed beyond a reasonable doubt that Kerley was a participant in, had knowledge of the planning of, and was present during the attempted robbery, which resulted in Bothwell's death. A finding of intent to kill or inflict great bodily harm was not necessary for him to be a principal to second degree murder occurring during the course of a robbery. Therefore, the evidence was sufficient to support the convictions of second degree murder, second degree battery, and obstruction of justice.

***Motion for New Trial***

Five days after the jury trial, defense counsel was advised that Jurors 9 and 10 had reported a conversation that took place during deliberations in which Juror 2 had informed the other jurors of her knowledge of the existence of the Circle K surveillance video, which was not admitted into evidence at trial, because she worked there and was present when the police picked up the video. An affidavit was executed by Juror 10 regarding the conversation. Juror 2 had not mentioned her employment at Circle K or her knowledge of the video during voir dire or any other point in the proceedings.

As a result, Kerley filed a motion for new trial on the basis that the outside influence of Juror 2 resulted in prejudicial error. The trial court denied Kerley's motion for a new trial, stating that jurors were presumed to be impartial, and it did not think the video would have changed the verdict of the jurors. Kerley, in turn, argued that the State did not show that the juror's statements regarding the evidence not presented at trial were harmless error.

16

The State asserts that Kerley's motion for new trial did not overcome the numerous substantive and procedural safeguards designed to ensure trial error could not have been discovered during trial. It further argues that Kerley had the burden of proof on the motion to show prejudicial error, which he failed to meet.

La. C. Cr. P. art. 851(B)(4) provides:

> The court, on motion of the defendant, shall grant a new trial whenever … the defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment.

The trial court has discretion in a motion for new trial in its determination whether a defendant was prejudiced by the noncompliance. *State v. Sharp*, 338 So. 2d 654 (La. 1976). The burden is on the defendant to show that the new evidence was not discoverable prior to or during trial and that if the evidence had been introduced at trial, the new evidence probably would have caused the trier of fact to reach a different verdict. *State v. McKinnies*, 13-1412 (La. 10/15/14), 171 So. 3d 861; *State v. Dukes*, 19-0172 (La. App. 4 Cir. 10/2/19), 281 So. 3d 745, *writ denied*, 19-01751 (La. 10/14/20), 302 So. 3d 1118. In the absence of any showing before the trial court that the rights of the accused had been jeopardized, and that the alleged injustice could be rectified at another trial, the court is warranted in its refusal to set aside the verdict. *McKinnies*, *supra*. Allegations raised in the motion alone are not sufficient, as a defendant has the burden to show that an injustice has been done to him. *Id*.

To receive a new trial, a defendant must show that the noncompliance alleged in the motion was prejudicial. *Sharp*, *supra*. The defendant must

17

also show that he was not aware of the juror's disqualification when accepted for service, and the information could not have been ascertained by due diligence. *State v. Herrod*, 412 So. 2d 564 (La. 1982); *State v. Baxter*, 357 So. 2d 271 (La. 1978). The defendant must have sought to discover the basis for the juror's disqualification with "reasonable diligence" prior to the jury's verdict. *Herrod*, *supra*; *Baxter*, *supra*; *State v. Hall*, 255 La. 854, 233 So. 2d 541 (1970). When the disqualification of a juror is relied upon as a basis for a new trial, defendant must show he questioned the juror on voir dire examination concerning the subject and the juror failed to disclose the relevant facts in order to satisfy the requirement of reasonable diligence. *State v. Neal*, 550 So. 2d 740 (La. App. 2 Cir. 1989), *writ denied*, 556 So. 2d 55 (La. 1990); *Baxter*, *supra*; *State v. O'Blanc*, 346 So. 2d 686 (La. 1977); *Hall*, *supra*.

In addition to the substantive requirements of La. C. Cr. P. art. 851(B)(4), defense motions for new trial must also satisfy the procedural requirements of La. C. Cr. P. art. 855, as follows:

> A motion for a new trial based on ground (4) of Article 851 shall contain allegations of fact sworn to by the defendant or his counsel, showing:
>
> (1) The specific nature of the error or defect complained of; and
>
> (2) That, notwithstanding the exercise of reasonable diligence by the defense, the error or defect was not discovered before or during the trial.

Motions for new trial governed by this Article must satisfy each of its procedural formalities, and a failure to do so independently justifies its denial. *Herrod*, *supra*; *State v. Jones*, 345 So. 2d 1157 (La. 1977); *State v. Veal*, 296 So. 2d 262 (La. 1974).

18

Kerley must show that the error in the proceedings – the alleged outside influence of Juror 2 – was prejudicial. Kerley originally claimed during the motion hearing that there was an affidavit stating that Juror 2 had stated she saw the video and saw Kerley in the video. However, Juror 10's affidavit regarding what Juror 2 had stated about having knowledge of the video never referred to any statement that she had seen the video, only that she knew a video existed. Kerley ultimately admitted that he had merely made inferences that Juror 2 had actually seen the video. Although the video was not presented at trial, the jury was aware of its existence because it had been referenced multiple times during the testimony of the officers. The fact that Juror 2 had knowledge of its existence due to her employment, in addition to what the jury was made aware of during the trial, is of no consequence. There was no evidence presented to show she had ever seen the video or that she knew it contained footage of Kerley. The affidavit regarding simply Juror 2's knowledge of the existence of the surveillance video was insufficient to show any prejudicial error in the proceedings.

During voir dire examination, defense counsel asked the potential jurors general questions regarding their background, nothing specific regarding job history, places of work, or family. They were asked specifically whether they watched the news and/or remembered this case. When Juror 2 was questioned, she stated that she currently worked at a seafood market, she did not watch the local news, and she did not remember the case. She was not specifically questioned regarding where she worked during the time of the incident or whether she had observed law enforcement obtaining the surveillance video. As such, she would not have provided any false information in response. Therefore, Kerley would not satisfy the

19

"reasonable diligence" requirement of La. C. Cr. P. art. 851(B)(4) as it pertained to that specific issue of juror disqualification.

Not only were the factual allegations in Kerley's motion for new trial insufficient, but his motion did not pass muster under La. C. Cr. P. art. 855. It only vaguely stated Kerley was unaware of the employment of the juror at Circle K. It did not clarify at what point he became aware of that fact, nor did it allege that fact was not discovered before or during trial. The motion also failed to allege that the defense exercised any due diligence to discover the juror's employment or knowledge regarding the video. Further, no allegations in the motion were sworn to by either Kerley or his trial counsel.

### *Failure to Grant Standby Counsel*

Kerley filed his first motion to terminate his retained trial counsel in May 2024, three months following the trial. The trial court granted the motion and appointed two public defenders. Approximately nine months later, in February 2025, Kerley filed a motion to terminate the newly appointed counsel and be recognized as co-counsel. At a hearing on April 28, 2025, the court denied the motion to be recognized as co-counsel, advising Kerley that he could not have appointed counsel and represent himself at the same time, but granted the motion to terminate counsel and granted permission for Kerley to represent himself. Following the hearing on Kerley's motion to recuse the trial judge, which was denied, the trial court heard the remaining pro se motions on April 30, 2025. Kerley filed an additional motion requesting standby counsel the same day (after the denial of the motion to terminate counsel and be recognize as co-counsel two days prior). The court summarily denied the motion, noting Kerley's untimeliness and delay tactics, stating that it had already decided the matter.

20

Kerley argues the trial court's denial of his request for standby counsel was prejudicial in that he was not prepared to present the necessary evidence to mitigate his sentence, thus losing that opportunity because of his lack of procedural understanding. The State argues that Kerley had no right to have an attorney appointed as an advisor.

While it may be within the discretion of a trial court to permit both a criminal defendant and his attorney to conduct different phases of the defense in a criminal trial, for purposes of determining whether there has been a deprivation of constitutional rights, a criminal defendant cannot logically waive or assert both rights. *State v. Bodley*, 394 So. 2d 584 (La. 1981). The defendant does not have a constitutional right to be both represented and representative, but the trial court has the discretion to appoint an attorney to assist a pro se defendant. *Id*.; *State v. Manuel*, 17-1145 (La. App. 3 Cir. 5/2/18), 247 So. 3d 766.

The trial court denied Kerley's request to be "co-counsel" with his attorneys, explaining that he could not both represent himself and have an attorney appointed and noting that he had not been using his attorneys for their intended purpose of giving legal advice. Kerley requested to terminate counsel since he could not be named as co-counsel, stating he felt he could do a better job than his counsel at representing his interests. The court held a full *Faretta* inquiry and repeatedly warned Kerley that his self-representation was a bad idea. The court found Kerley's waiver of his right to counsel knowingly, intelligently, and voluntarily made, and his request was not made to manipulate the system.

Kerley insisted he be self-represented despite being fully aware that his sentencing was looming. Yet, two days later, the same day as

21

sentencing, he filed a recrafted motion for standby counsel and requested a continuance, claiming he would be prejudiced by his lack of procedural knowledge. The trial court denied the additional motions, noting their untimeliness since sentencing had been pending for over a year, and stating it believed they were simply a delay tactic. We agree. The trial court was well within its discretion to deny Kerley's untimely filing of an additional motion for standby counsel.

***Failure to Observe Sentencing Delays***

After the trial court denied Kerley's post-trial motions and request for continuance and proceeded to sentencing, Kerley stated, "Your Honor, with all due respect, I do not authorize you to pass sentence." The trial court replied, "Well with all due respect there's no law that doesn't allow me to impose a sentence at this time." The court then imposed Kerley's sentences without advising of any delays.

Kerley argues he was prejudiced by the court's imposition of sentences without honoring the mandatory delays, because he did not get the opportunity to argue his case at sentencing or present mitigating evidence because of his lack of knowledge and understanding of procedure, which he claims could have been resolved by honoring the delays. Because he is challenging his sentences, Kerley urges that the sentences imposed must be vacated and the case remanded for resentencing.

La. C. Cr. P. art. 873 requires that a sentence shall not be imposed until at least 24 hours after a motion for new trial is overruled unless the defendant expressly waives the delay. Vacation of a sentence for failure to observe the 24-hour delay is not required, however, if the error is harmless and no prejudice is shown. *State v. Wallace*, 46,422 (La. App. 2 Cir.

22

8/10/11), 71 So. 3d 1142, *writ denied*, 11-1962 (La. 2/3/12), 79 So. 3d 1026, *citing State v. White*, 404 So. 2d 1202 (La. 1981); *State v. Bobo*, 46,225 (La. App. 2 Cir. 6/8/11), 77 So. 3d 1, *writ denied*, 11-1524 (La. 12/16/11), 76 So. 3d 1202. Failure to observe the 24-hour delay is harmless when the defendant either does not complain of his sentence on appeal or when the sentence imposed is mandatory. *State v. Austin*, 49,061 (La. App. 2 Cir. 7/16/14), 146 So. 3d 716, *writ denied*, 14-2323 (La. 9/18/15), 178 So. 3d 140; *State v. Green*, 10-1355 (La. App. 4 Cir. 6/22/11), 69 So. 3d 695, 703, *writ denied* (La. 1/20/12), 78 So. 3d 140; *State v. Pollard*, 14-0445 (La. App. 4 Cir. 4/15/15), 165 So. 3d 289, *writ denied*, 15-0926 (La. 4/22/16), 191 So. 3d 1044.

Albeit there was no indication in the record that Kerley expressly or implicitly waived the 24-hour delay, his sentence of life imprisonment without benefits under La. R.S. 14:30.1(B) is mandatory. Therefore, any error in the proceeding was harmless, and the Court is not required to take any action.

***Excessive Sentence***

Kerley claims that the trial court failed to consider the mitigating factors set forth in defense counsel's sentencing memorandum filed on April 15, 2025. He asserts that the trial court's reference to his failure to give a statement for the PSI and to otherwise argue mitigating factors was in error. Kerley refers to the law regarding an appellate court's review of sentences for excessiveness but does not give further reasoning for its arguments.

The trial court stated during the sentencing hearing that it had reviewed the PSI, and it noted the statement from the victim's mother, Kerley's lack of any prior criminal history, and his refusal to give any type

23

of statement. It also noted Kerley's refusal to offer any mitigating factors at the hearing. The court stated that, per La. C. Cr. P. art. 894.1, it considered all the referenced issues, all evidence presented, the nature of the offense, and Kerley's lack of remorse.

Kerley was convicted of the charge of second degree murder in violation of La. R.S. 14:30.1. Subsection B provides, "Whoever commits the crime of second degree murder *shall* be punished by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence." (*Emphasis added*.) Accordingly, the court imposed the mandatory sentence of life imprisonment at hard labor without benefits for the charge. The court also imposed sentences of five years for second degree battery and ten years for obstruction of justice, both at hard labor. All charges were ordered to run concurrently.

The trial court adequately considered the guidelines of La. C. Cr. P. art. 894.1 for all of the charges. However, it had no discretion to order a lesser sentence for the second degree murder charge. Further, no additional sentence was imposed for the remaining charges since they ran concurrently with the life sentence. Therefore, any arguments regarding the applicability and requirements of mitigating factors per La. C. Cr. P. art. 894.1, or for constitutional excessiveness, are moot.

**CONCLUSION**

For the reasons stated hereinabove, Kerley's convictions and sentences are hereby AFFIRMED.

24